HARRAH'S CLUB, a Nevada Corporation, Appellant, *v.* STATE OF NEVADA; NEVADA GAMING COMMISSION and STATE GAMING CONTROL BOARD, Respondents.

No. 13441

March 10, 1983 659 P.2d 883

*Vargas & Bartlett,* and *John P. Sande, III,* and *Bruce A. Leslie,* for Appellant.

*Brian McKay,* Attorney General, and *Tudor Chirila,* Deputy Attorney General, Carson City; and *James C. Giudici,* Deputy Attorney General, Las Vegas, for Respondents.

## OPINION

*Per Curiam:*

The facts underlying this appeal are not disputed. Appellant Harrah's Club, a Nevada corporation engaged in casino gaming enterprises, maintains a "premium point" program

whereby coupons are issued to a casino patron winning certain slot machine jackpots or bingo games. The number of premium points won is determined by an established, published payout schedule, and these points are paid out in addition to pecuniary winnings.

A player receiving premium points after a payout has the option of redeeming them either for a cash certificate or merchandise at appellant's premium point redemption center-gift shop. If the patron chooses to redeem the points for cash, the coupons are exchanged for a "cash certificate" having a value of three-fourths of a cent per premium point. These cash certificates may in turn be presented to the casino cashier for payment in the same manner as "chips" or other gaming tokens. If the patron chooses to redeem the points for merchandise, this may be done directly at the redemption center at a rate of one cent per premium point toward the purchase price of the item selected.

The controversy which occasioned this appeal arose as a result of appellant's premium point accounting practices. Gaming license fees are computed on the basis of gross revenues from gaming operations. NRS 463.370. "Gross revenue" is broadly defined as the total of all sums received as winnings less only the total of all sums paid out as losses by a state gaming licensee. *See* NRS 463.0161.[1] In computing its gross revenue, appellant deducts as "sums paid out as losses" the amount paid to patrons turning in their "cash certificates" and the wholesale cost of merchandise that is allocated to premium point redemption credits.

It is appellant's practice of deducting the disbursements made in connection with the premium point program from all sums received as winnings in calculating its gross revenues which lead to this appeal. Respondent Gaming Control Board (Board) promulgated Regulation 6.080(3) which provided: "Gross revenue shall be computed without reference to or deduction for any direct or indirect prizes, drawings, awards, benefits or other promotional allowances, except cash at face value directly paid out as a result of a specific wager."[2] Pursuant to this regulation, the Board characterized appellant's

---

[1] During the period relevant to this discussion, the definition of "gross revenue" was set forth in NRS 463.0114. This section has been repealed and replaced with NRS 463.0161. For the purposes of this discussion, however, there is no difference between the two provisions.

[2] Regulation 6.080 was subsequently amended, and no longer contains this restriction or its equivalent. The restriction formerly contained in Regulation 6.080(3), however, has been codified in NRS 463.3715.

premium point program as promotional, disallowed all premium point deductions from gross gaming revenue, and assessed appellant's license fees without allowing for premium point disbursements.

Appellant sought a declaratory judgment to the effect that premium point disbursements are deductible from the gross revenues upon which license fees are based. Appellant filed a timely motion for summary judgment; respondents filed a cross-motion for summary judgment. The district court concluded appellant's premium point system was "promotional" within the meaning of Regulation 6.080(3), and granted respondents' motion for summary judgment.

We disagree with the district court's conclusion. The dispositive issue presented in this appeal is whether appellant's premium point disbursements are "gaming losses" deductible from gaming winnings when calculating the gross revenues subject to gaming licensing fees. We believe appellant's premium point disbursements do represent gaming losses, and as such are deductible from winnings in calculating gross revenues.

We recognize that not all expenses incurred in connection with the operation of a gaming establishment may be legitimately characterized as "gaming losses." In most business enterprises the usual method of increasing profits is to increase the number of transactions. In turn, a common method of increasing the number of transactions is the use of marketing and promotional activities. The gaming industry is no exception. As part of their marketing and promotional activities, many casinos utilize gaming "loss leaders" such as free slot play, promotional coupons or "lucky bucks," and free "wheel of fortune" play. The casino patron has no "stake" at risk in these promotional "wagers," as they cost the patron nothing. Thus, such promotional "wagers" can only produce "losses."

There is an obvious distinction to be drawn between the losses generated by these kinds of purely promotional activities and the losses generated by the premium point program at issue in the instant appeal. Promotional activities and coupons occasion losses which are not the result of actual wagering transactions, but rather marketing expenses which are the gaming establishment's normal cost of doing business. In contrast, the losses resulting from appellant's premium point program arise as the result of a legitimate wager. Both parties to the transaction have a chance of gain and take a risk of loss. *See* Las Vegas Hacienda v. Gibson, 77 Nev. 25, 28, 359 P.2d 85 (1961). The number of premium points to be awarded with a given jackpot is set forth in a published payout schedule; the patron

presumably makes his wager anticipating both a pecuniary and premium point return. The fact that Harrah's cannot win back premium points does not indicate that such a transaction is not a wager. *See* Ex Parte Pierotti, 43 Nev. 243, 184 P. 209 (1919) (slot machine which pays off in the form of cigars or drinks is a gaming device).

Thus, it appears that appellant's premium point program produces gaming "losses" which may be deducted from gaming "winnings" in calculating gross revenues for the purpose of determining licensing fees. This conclusion is dispositive of the instant appeal, although there remains an additional point that warrants further comment. Respondents maintain that if gaming establishments are allowed to deduct the cost of merchandise purchased through the premium point program as a gaming loss, a tremendous problem of "skimming" or bookkeeping manipulation might arise. Respondents are apparently concerned that gaming establishments might manipulate the cost of merchandise to an artificially high level, thereby incurring greater gaming "losses" and depriving this state of revenue to which it is properly entitled.

We are confident, however, that respondents' auditing and inspection powers are sufficient to guard against such skimming or obvious restructuring of the cash value of merchandise redeemed through a premium point program. For the reasons articulated above, therefore, we hereby reverse the judgment of the district court, and order judgment be entered for appellant.

MANOUKIAN, C. J., SPRINGER, MOWBRAY, and STEFFEN, JJ., and ZENOFF, SR. J.,[3] concur.

---

[3]The Chief Justice assigned SENIOR JUSTICE DAVID ZENOFF to participate in the decision of this matter, in the place and stead of THE HONORABLE E. M. GUNDERSON, Justice, pursuant to the Nevada Constitution, art. 6, § 19(1)(a) and 19(1)(c), and SCR 10.